## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 04 2017, 9:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald K. Smith
Public Defender
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cory M. Wallace,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | August 4, 2017<br><br>Court of Appeals Case No.<br>18A02-1611-CR-2691<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Marianne L. Vorhees, Judge<br><br>Trial Court Cause No.<br>18C01-1508-F1-4 |

**Vaidik, Chief Judge.**

# Case Summary

In 2015, Cory Wallace set fire to his Muncie house to cover up the fact that he had battered and failed to seek medical care for his four-month-old son, resulting in the infant's death. He was convicted of numerous crimes and sentenced to seventy-two years. He now appeals, arguing that the trial court erred in admitting numerous pieces of evidence and that the trial court made mistakes in sentencing him. Finding no errors, we affirm the trial court in all respects.

# Facts and Procedural History

On February 10, 2015, twenty-two-year-old Wallace and his pregnant wife, Sheryl, were living with their four-month-old son, J.W., and Sheryl's mother in Muncie. Twenty days earlier, Wallace had pled guilty in Marion County to Class D felony neglect of a dependent for failing to seek medical treatment for injuries to another son he had with a different woman and was sentenced to one year of house arrest and two years of probation. State's Ex. 146. At 7:25 p.m., while Sheryl's mother was at work, Wallace called 911 to report that their house was on fire and that J.W. was trapped inside. The Muncie Fire Department was dispatched at 7:26 p.m. Wallace and Sheryl were waiting outside when first responders arrived. Firefighters entered the house and found J.W. in his bedroom laying in his playpen with flames nearby. Firefighters removed J.W. from his playpen and took him outside where paramedics were waiting. From the time of dispatch until the time firefighters handed J.W. to

paramedics, less than four minutes had elapsed.  Tr. Vol. I p. 94.  According to firefighters, there "couldn't have [been] a faster scenario."  *Id.* at 95.

[3]     Paramedics ran with J.W. to a nearby parked ambulance and conducted an assessment; J.W. had no pulse, was not breathing, and had no heartbeat.  He was pronounced dead at 7:41 p.m.  At no time did Wallace or Sheryl approach the ambulance to check on their son.  Paramedics took J.W.'s body to the morgue at IU Health Ball Memorial Hospital.

[4]     Wallace and Sheryl, who had not yet been told by authorities about J.W.'s death, were also taken to Ball Memorial Hospital, where they were examined by an emergency-room physician, Dr. Ryan Wallace.  Wallace told Dr. Wallace that he burned his right hand while opening the door to J.W.'s bedroom and that he was experiencing shortness of breath and chest pain. There was a red area on Wallace's right hand, but according to Dr. Wallace it was not a burn.  While in the emergency room, Wallace never asked about J.W.; he did, however, ask for pain medicine at least three times.

[5]     Also while in the emergency room, Muncie Police Department Sergeant Seth Stanley spoke with Wallace about the events leading up to the 911 call. Wallace told Sergeant Stanley that he smelled smoke in the house and went to J.W.'s bedroom.  He opened the door, at which point he encountered smoke. Fire then "flashed" in his face, forcing him to put up his arms to block the fire. *Id.* at 172.  Because he could not get to J.W., he and Sheryl exited the house. Sergeant Stanley noted several things during his conversation with Wallace:

Wallace did not have any burns or singe marks on him despite fire allegedly flashing in his face, he had "no emotion," he was "very calm" and "matter-of-fact," and he "never asked about [J.W.]." *Id.* at 174.

[6] When the family was brought together to be told about J.W.'s death, Wallace showed no change in demeanor, while Sheryl showed relief. Only the extended family members were visibly upset by the news.

[7] While the initial plan had been to bring J.W.'s body to Wallace and Sheryl in the emergency room that night, as it was customary to do so, that plan changed when Sergeant Stanley was summoned to the morgue to inspect J.W.'s body. Because Sergeant Stanley observed injuries to J.W.'s body that were unrelated to the fire, the decision was made to begin a criminal investigation into J.W.'s death.

[8] Accordingly, Wallace was interviewed by police in the early-morning hours of February 11. He was advised of his *Miranda* rights and then waived them in writing. State's Ex. 133. Wallace told police that he smelled something "funky" around 6:30 p.m., checked the house but found nothing, and then fell asleep with Sheryl in their master bedroom. Ex. 112A, p. 111. About thirty minutes later, however, he and Sheryl awoke to thick smoke in their bedroom. He went to J.W.'s bedroom and saw black smoke at the door and "knew immediately something was on fire." *Id.* When he opened the door, there was a "flash" of fire and he burned his right hand. *Id.* at 155. Wallace surmised

that the space heater in J.W.'s room started the fire. Wallace was allowed to leave at the end of the interview.

[9] Following this interview, the investigation into J.W.'s death continued into the spring and summer of 2015. This investigation revealed the following information. The forensic pathologist who conducted J.W.'s autopsy concluded that J.W. had died before the fire started. The cause of J.W.'s death was blunt force trauma to the head, which consisted of a left subdural hemorrhage, a left orbital epidural hemorrhage, and cortical contusions. The forensic pathologist noted additional injuries to J.W., including a torn frenulum[1]; scrapes, abrasions, and circular burns to J.W.'s scalp, face, neck, ears, chest, back, arms, and legs; and two fractured ribs (one that was new and one that was healing). The forensic pathologist determined that J.W.'s injuries were caused by inflicted abuse. The investigation also revealed that J.W. had never been seen by a pediatrician since he was born. In addition, the Chief Fire Investigator for the Muncie Fire Department concluded that the fire originated in J.W.'s bedroom, that there were two origins in J.W.'s bedroom (near the playpen and near a rocking chair), and that the fire was incendiary, that is, intentionally set.[2] Tr. Vol. II pp. 20-23. The State Fire Marshal reached the

---

[1] The frenulum is the piece of tissue that connects the lips (upper and lower) to the gums. Tr. Vol. II p. 125. A torn frenulum is a "sentinel injury" of child abuse, because "it's a sign of what's going on with the child." Tr. Vol. III p. 21. A torn frenulum is typically caused by shoving something into the mouth so hard that the tissue is torn. *Id.* at 20.

[2] The space heater was sent to the United States Bureau of Alcohol, Tobacco, Firearms and Explosives Fire Research Laboratory in Maryland for analysis by an electrical engineer and eliminated as a source of the fire.

same conclusions as the Chief Fire Investigator. Finally, the investigation revealed striking similarities in injuries between J.W. and Wallace's other son, G.R., who was the victim of his January 2015 neglect conviction. That is, G.R., who was about two months old at the time of his injuries, had a torn frenulum, injuries to his ear, and fractured ribs. State's Ex. 147.

[10] Police scheduled two additional interviews with Wallace, but he did not show up for them. On August 7, 2015, Muncie police went to Wallace's probation appointment in Indianapolis, where he was living at the time. They then transported Wallace to an Indianapolis Metropolitan Police Department office to interview him. Wallace was advised of his *Miranda* rights and waived them in writing. State's Ex. 114A, pp. 188-90; Ex. 144. Wallace initially repeated his story of trying to save J.W. but not being able to do so because of the fire in J.W.'s bedroom. But when confronted with the autopsy and fire-investigation results, Wallace changed his story: he now blamed Sheryl for injuring J.W. and starting the fire. At this point, police—not believing Wallace's story that Sheryl was responsible—told Wallace that the interview was over and escorted him out of the interview room. While in the hallway, Wallace told police that he would tell them everything if he had a cigarette. After smoking a cigarette, Wallace was brought back into the interview room. Upon returning, Wallace was reminded that he was "still under *Miranda* and all that stuff." State's Ex. 114A, p. 404. Wallace acknowledged this and said, "I'll talk to you guys again. I don't need a lawyer." *Id.* Wallace proceeded to tell police that he dropped J.W. on the hardwood floor around 2:00 a.m. and panicked. He then put J.W.

in his playpen despite knowing that J.W. was injured because he was "in and out of it." *Id.* at 412. Around 9:00 a.m. Wallace realized that J.W. was dead. Wallace admitted starting the fire around 7:00 p.m. by twisting and setting fire to notebook paper and then throwing the paper near J.W.'s playpen and rocking chair. Wallace was arrested at the end of this interview.

[11] The State charged Wallace with Count 1: Level 1 felony neglect of a dependent resulting in death, Count 2: Level 3 felony battery resulting in serious bodily injury to a person less than fourteen years old (broken ribs), Count 3: Level 4 felony arson, Count 4: Level 5 felony battery to a person less than fourteen years old (cuts, lacerations, or abrasions to the skin), and Count 5: Level 6 felony obstruction of justice (statements made during February 11, 2015 interview with police).[3] Appellant's App. Vol. II pp. 26-30.

[12] Before trial, the State filed a notice of its intent to admit Indiana Evidence Rule 404(b) evidence in the form of Wallace's January 2015 conviction in Marion County for neglecting G.R. The trial court ruled that this conviction was admissible as motive for the arson (to conceal the act of neglect in Delaware County), to rebut Wallace's claim that he accidentally dropped J.W. (lack of accident), and under the knowledge exception because it showed that Wallace

---

[3] Sheryl pled guilty to Level 1 felony neglect of a dependent resulting in death and was sentenced to thirty years.

knew he was placing J.W. in a dangerous situation. Appellant's App. Vol. III pp. 10-14.

[13] In addition, Wallace moved to suppress the statements he made to police during his interviews on February 11 and August 7, 2015. He claimed that he was not properly advised of nor did he waive his *Miranda* rights. Appellant's App. Vol. II pp. 92, 120. A hearing was held, *see* Tr. Vol. I pp. 4-31, following which the trial court ruled that the statements Wallace made during the February 11 interview were admissible, the statements he made during the recorded portion of the August 11 interview were admissible, and the statements he made in the hallway on August 11 were inadmissible. Appellant's App. Vol. II pp. 189-92.

[14] A jury trial was held in September 2016. Wallace testified in his own defense that he was holding J.W. and that J.W. fell to the floor when Sheryl tried to grab J.W. from him; in short, he blamed Sheryl for dropping J.W. He further testified that he and Sheryl made the decision to start the fire but that Sheryl actually started it. The jury found Wallace guilty as charged.

[15] At the sentencing hearing, the trial court identified numerous aggravators, some of which it found applied to only certain convictions: (1) J.W. was only four months old; (2) Wallace was on home detention at the time of J.W.'s death for neglect of a dependent, G.R.; (3) Wallace never took J.W. to a pediatrician, which was intentional on his part to hide J.W.'s injuries; (4) the injuries to J.W. were "gruesome" and beyond words; (5) Wallace showed "zero emotion" and

no remorse during the proceedings; (6) Wallace was in a position of trust with J.W. and violated that trust; (7) J.W.'s injuries were greater than necessary to prove the battery counts; (8) J.W. was "grossly underweight" for his age; (9) the purpose of the arson was to burn J.W.'s body so that the authorities could not detect the abuse; and (10) Wallace planned the arson by removing the smoke detectors before starting the fire to allow more time for the fire to spread without alerting anyone. Tr. Vol. III pp. 159-60. The trial court found two mitigators, both of which it found had "very minimal weight": (1) Wallace had strong emotional and personal support from family and friends and (2) imprisonment would result in undue hardship to his dependents. *Id.* at 162.

[16] In pronouncing Wallace's sentence, the trial court noted that "[i]n almost fourteen (14) years of service as a judge in this Court I have never seen such horrible injuries inflicted on a child, let alone a helpless infant." *Id.* at 165-66. The trial court then sentenced Wallace to forty years for Count 1, sixteen years for Count 2, ten years for Count 3, six years for Count 4, and one year for Count 5. The court ordered Counts 1-4 to be served consecutively and Count 5 to be served concurrently, for an aggregate term of seventy-two years.

[17] Wallace now appeals.

# Discussion and Decision

[18] On appeal, Wallace raises six issues that challenge the admission of various pieces of evidence and his sentence. The State contends that he has waived each issue for failing to present cogent reasoning supported by citations to authorities and the record. *See* Ind. Appellate Rule (A)(8)(a). We agree with the State that Wallace has waived some of his arguments, and we address the remaining ones below.

# I. Admissibility of Statements to Police

[19] Wallace first contends that the trial court abused its discretion in admitting the statements he made to police during the August 7, 2015 interview. At the beginning of the August 7 interview, Wallace was advised of his *Miranda* rights and then waived them in writing. State's Ex. 144. After taking a break and returning to the interview room, Wallace was reminded that he was "still under *Miranda* and all that stuff."[4] State's Ex. 114A, p. 404. Wallace acknowledged this and said, "I'll talk to you guys again. I don't need a lawyer." *Id.* At this point, Wallace admitted dropping J.W. on the floor, panicking, and starting the fire as a cover up.

---

[4] Wallace does not argue that he was entitled to a full *Miranda* advisement upon his return to the interview room as opposed to just a reminder.

[20]    Wallace argues that police, by conducting the August 7 interview in two parts, engaged in the sort of "question-first" "Mirandize-later" approach that was condemned by the United States Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). In that case, the Supreme Court disapproved of the interrogation technique in which interrogating officers purposefully withhold *Miranda* warnings until after a suspect has confessed and thereafter give *Miranda* warnings and secure a waiver before obtaining a second, similar confession. *Id.* at 611-14. But Wallace was not subjected to pre-*Miranda* interrogation here. Instead, Wallace was given his *Miranda* warnings and waived them at the very beginning of the interview, took a break, and was then reminded about his *Miranda* warnings after resuming the interview, at which point he admitted his involvement in J.W.'s death and the fire. There is no violation of *Seibert*. Accordingly, the trial court did not abuse its discretion in admitting the statements Wallace made to police during the August 7 interview.[5]

---

[5] To the extent Wallace makes other arguments regarding the statements he made to police during the August 7 interview, such as that his waiver was not knowing and voluntary, he has waived them for failing to make cogent arguments supported by citations to the record. *See* App. R. 46(A)(8)(a).

On a related note, before trial, Wallace filed a motion to redact portions of his statements to police. The trial court redacted several portions of Wallace's statements. *See* Appellant's App. Vol. III pp. 163-64. On appeal, Wallace argues that the trial court erred in not redacting additional portions. He cites various grounds to support these additional redactions, such as Evidence Rules 404 and 704; however, he does not list the actual statements he claims should be redacted. Rather, he merely lists the page numbers where these allegedly objectionable statements appear, leaving us to guess what the statements are. *See* Appellant's Br. p. 12 ("The objected to portions are as follows: pg. 82, 84-87, 106, 108, 120, 125, 126-128, 137-139, 146, 147-148, 151, 153, 214, 221, 241."). He has therefore waived this issue.

# II. Admissibility of Neglect Conviction

[21] Wallace next contends that the trial court erred in admitting evidence of his January 2015 neglect-of-a-dependent conviction concerning his other son, G.R. Indiana Evidence Rule 404(b) provides that evidence of a crime, wrong, or other act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Indiana Evidence Rule 403 provides, in turn, that evidence, even if relevant, should be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Therefore, when the State seeks to use evidence of a crime, wrong, or other act, the court must (1) determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act and, if so, (2) balance the probative value of the evidence against its prejudicial effect. *Hicks v. State,* 690 N.E.2d 215, 221 (Ind. 1997). We review a trial court's ruling for an abuse of discretion. *Spencer v. State*, 703 N.E.2d 1053, 1057 (Ind. 1999).

[22] Here, the trial court ruled that Wallace's neglect conviction was admissible under Evidence Rule 404(b) on three separate grounds—motive, lack of accident, and knowledge. Appellant's App. Vol. III p. 14; s*ee also* Tr. Vol. I p. 129 (trial court reaffirming its pretrial ruling when the evidence was admitted

during trial). On appeal, Wallace argues that his neglect conviction was not admissible to prove "identity" and "intent." Appellant's Br. pp. 13-14. But the trial court did not admit Wallace's neglect conviction for either of these purposes. Moreover, the trial court expressly found that the conviction was **not** admissible to prove identity. Appellant's App. Vol. III p. 14. And even if the neglect conviction was not admissible to prove intent, which we doubt given that the admissibility of crimes, wrongs, and other acts to establish intent and absence of mistake/lack of accident is well established in child-abuse cases, *see Ceaser v. State*, 964 N.E.2d 911, 915 (Ind. Ct. App. 2012), *trans. denied*, Wallace makes no argument on appeal that the three grounds the trial court found applied are improper. We therefore affirm the trial court's admission of Wallace's earlier neglect conviction.

## III. Dr. Wallace's Testimony

[23]     Wallace next contends that the trial court erred in admitting Dr. Wallace's testimony that addressed his statements "regarding his treatment."[6] Appellant's Br. p. 15. He cites Indiana Code section 34-46-3-1, which provides, in relevant part:

---

[6] To the extent Wallace challenges additional portions of Dr. Wallace's testimony, he has waived such challenge for failing to develop it.

> Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications:
>
> * * * * *
>
> (2) Physicians, **as to matters communicated to them by patients, in the course of their professional business**, or advice given in such cases.

(Emphasis added). Dr. Wallace testified that Wallace complained of shortness of breath/chest pain and a burn to his right hand. Wallace told Dr. Wallace that he fell asleep and woke up when the smoke detector went off. He went to his baby's room and tried to open the door but burned his hand.

[24] The State responds that Indiana Code section 31-32-11-1 abrogates the physician-patient privilege in judicial proceedings resulting from a report of child abuse or relating to the subject matter of the report. The statute provides:

> The privileged communication between:
>
> (1) a husband and wife;
>
> (2) a health care provider and the health care provider's patient;
>
> (3) a:
>
>> (A) licensed social worker;
>>
>> (B) licensed clinical social worker;

(C) licensed marriage and family therapist;

(D) licensed mental health counselor;

(E) licensed addiction counselor; or

(F) licensed clinical addiction counselor;

and a client of any of the professionals described in clauses (A) through (F);

(4) a school counselor and a student; or

(5) a school psychologist and a student;

is not a ground for excluding evidence in any judicial proceeding resulting from a report of a child who may be a victim of child abuse or neglect **or** relating to the subject matter of the report **or** failing to report as required by IC 31-33.

Ind. Code § 31-32-11-1 (emphases added); *see J.B. v. E.B.*, 935 N.E.2d 296, 300 (Ind. Ct. App. 2010) ("Section 31-32-11-1 is designed to reconcile the operation of various privileges with Indiana's reporting statute, Indiana Code section 31-33-5-1, which requires any person who has reason to believe that a child is the victim of abuse or neglect to make a report.").

[25] The State, however, makes no argument that there was a "report" for purposes of Section 31-32-11-1. *Cf. J.B.*, 935 N.E.2d at 297 (Father reported his son's inappropriate touching of his daughter to DCS); *Hayes v. State*, 667 N.E.2d 222

(Ind. Ct. App. 1996) (therapist called DCS to report suspected abuse following therapy session in which patient admitted molesting his stepdaughter). In any event, as the State notes, Wallace's statements to Dr. Wallace regarding his treatment are merely cumulative of statements he made to various other people in this case. *See, e.g.*, Tr. Vol I. pp. 164, 172-173; State's Ex. 112A, pp. 110-12, 155-56; State's Ex. 114A, pp. 202-03. Accordingly, even if the trial court erred in admitting this testimony, the error is harmless.[7] *See Johnson v. State*, 6 N.E.3d 491, 499 (Ind. Ct. App. 2014) (holding that any error in the admission of evidence is harmless if it is cumulative of other appropriately admitted evidence).

## IV. Sentencing

[26] Last, Wallace challenges his seventy-two-year sentence. Specifically, he argues that the trial court erred in finding two aggravators.[8] Our trial courts enjoy broad discretion in finding aggravators, and we will reverse only for an abuse of that discretion. *Coy v. State*, 999 N.E.2d 937, 946 (Ind. Ct. App. 2013).

---

[7] Wallace also argues that the trial court erred in admitting the testimony of Dr. Tara Harris, a child-abuse pediatrician at Riley Hospital. Wallace has waived this issue for failing to present a cogent argument. *See* App. R. 46(A)(8)(a).

[8] Wallace's brief states: "Wallace submits that the appropriate standard of review is whether the court's sentence was inappropriate in light of both the nature of his offense and his character, pursuant to Appellate Rule 7(B)." Appellant's Br. p. 16. However, it is clear from reading the whole issue that Wallace is really challenging the aggravators that the trial court found. There is no analysis in his brief of the nature of the offenses and his character. Even if such an argument had been made, it would have been unsuccessful. We therefore treat Wallace's argument as one challenging the trial court's sentencing discretion.

[27] Wallace first argues that the trial court erred in finding as an aggravator that J.W.'s injuries were greater than necessary to prove the two battery counts. *See* Tr. Vol. III p. 160 ("I also find as aggravators on these two (2) counts the injuries to the child were greater than the elements necessary to prove the commission of the offenses."). But Wallace does not develop this argument with citation to authority or the record. He has therefore waived it. *See* App. R. 46(A)(8)(a).

[28] Wallace next argues that the trial court erred in finding as an aggravator that he lacked remorse. Wallace claims this aggravator is erroneous because he is entitled to maintain his innocence. In support, he cites *Bluck v. State*, 716 N.E.2d 507 (Ind. Ct. App. 1999). In that case, we held that a lack of remorse by a defendant who insists upon his innocence may be a valid aggravator. *Id.* at 513. We acknowledged an exception where the only evidence of the defendant's guilt is the victim's uncorroborated testimony. *Id.* Here, however, there is considerable evidence of Wallace's guilt. And, notably, Wallace does not contend otherwise. Accordingly, the trial court did not abuse its discretion in finding as an aggravator that Wallace lacked remorse. Moreover, even without this aggravator, there are numerous aggravators that Wallace does not challenge. We therefore affirm Wallace's seventy-two-year sentence.

[29] Affirmed.

Mathias, J., and Crone, J., concur.